In re Michael G. BRANDON & Virginia A. Ducharme–Brandon, Debtors.

Bankruptcy No. 94–00032.

United States Bankruptcy Court,
N.D. Florida,
Gainesville Division.

April 21, 1995.

David E. Maxwell, Ocala, FL, for debtors.

Mark J. Freund, Trustee, Tallahassee, FL.

### MEMORANDUM OPINION ON TRUSTEE'S MOTION FOR TURNOVER OF NON–EXEMPT PROPERTY

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER came on for hearing on April 6, 1995 on the motion of Mark Freund, trustee in this Chapter 7 bankruptcy case for turnover of non-exempt property of the debt-

ors with respect to $1,088.78 in an income tax refund and $13,337.79 in real estate commissions, all of which were received by the debtors post-petition. For the reasons set forth herein, the trustee's motion will be granted and the debtors will be ordered to turnover to the bankruptcy estate the sum of $14,426.57.

The facts of this case are fairly straightforward and are not in serious dispute. With respect to the income tax refund, the debtors have conceded that it is property of the estate and should be turned over to the trustee. The debtors in this case are both licensed real estate salespersons who at all times material to this matter were associated with Watson Realty Corporation, a real estate brokerage firm in Gainesville, Florida. In 1992, Mr. Brandon listed for sale two adjacent properties located in Alachua County, one property being owned by James Winter, (the "Winter Property") and the other property owned by parties referred to as Richardson and White (the "Richardson Property"). While the listing agreements were not submitted at the hearing, the testimony of Brandons was that the agreements were for a term of one year. During the term of the listings, Mr. Brandon moved from property sales to property management in the Watson Realty organization and turned over the listings to his wife, Arlene Ducharme–Brandon (Arlene Brandon).

On May 20, 1993 an offer to purchase the Winter property was made by Howard Wallace and Tom Spain and presented through Bosshardt Realty Services, Inc. to Arlene Brandon as the listing real-estate agent. The contract was accepted by the sellers on May 28, 1993 and July 9, 1993 and provided for a date of closing by August 28, 1994. On September 10, 1993, Spain and Wallace submitted a purchase offer on the Richardson property which was accepted by the sellers on September 20th and September 21st of 1993. This contract likewise had a closing date of August 28, 1994 and was presented by Michael Ryals of Bosshardt Realty, as was the contract on the Winter property.

Each contract contained a provision making the contract contingent upon buyer obtaining necessary approvals for land use and zoning to allow development of the property into a single family subdivision. Both contracts contained identical language in the contingency provision as follows:

Buyer shall have until August 1, 1994 to secured such approvals. If buyer is unable to obtain such approvals, it is understood and agreed that subject property will be returned to seller in its present condition with a guarantee of no liens, damage or encumbrances as a result of buyer's efforts. If buyer is unable to obtain the necessary approvals and zoning for developing subject property as intended, buyer shall notify seller in writing (on or before August 1, 1994) and this contract shall be null and void with a deposit being returned in full to buyer. Buyer will diligently pursue permitting and engineering and will keep seller regularly advised of progress. Buyer may waive this contingency.

The contracts also provide for extension of the closing date by buyer for up to four successive thirty day periods with the payment of additional binders of $5,000 prior to each such extension. Both contracts were accompanied by deposits which were placed in the Bosshardt Realty escrow account.

In the interim period between the execution of the two contracts for sale and their ultimate closing, the debtors filed their joint petition for relief under the Chapter 7 of the Bankruptcy Code on February 11, 1994. Mark Freund was duly appointed as trustee.

As of August 23, 1994, the buyers had not yet been able to obtain the necessary approvals for their subdivision. On that date, Michael Ryals sent a letter to Arlene Brandon advising her that the state was objecting to the proposed land use but that Wallace was going to respond to the state's objections and resubmit the application for reconsideration. A copy of this letter was sent to Mark Freund by Watson Realty Corporation with the following notation at the bottom:

Mr. Freund: The above is the letter that was received by Arlene Brandon regarding the properties that you asked about. Since the state objected to the land use changes for these parcels, when or whether a closing will take place in uncertain. I do hope that this answers your inquiry.

Prior to August 1, 1994, Spain and Wallace did not give written notification to the sellers of their inability to obtain the necessary approvals nor did they ever request that their deposits be returned. At the hearing on this matter, the debtor's counsel advised the court that the deposits were tendered but not accepted by the sellers and thus the deposit remained in the Bosshardt Realty Escrow account.

On September 7, 1994, the buyers executed a document entitled "Agreement to Extend Closing Date" which provided for as follows:

Tom Spain and Howard Wallace, hereinafter referred to as buyers, and Jim Winter et al., hereinafter referred to as seller, hereby agreed to the following amendments to that certain purchase/sale agreement dated September 10, 1993 referencing approximately 37 acres of tax parcel No. 6065, Alachua County, Florida.

1) The date of closing is hereby extended to December 5, 1994 to allow buyer additional time to secure approval of a request for a land use amendment on subject property (C.P.A. 1–94).

2) Buyer agrees to close this transaction within thirty (30) days following confirmation of the State of Florida and Alachua County that buyers requested land use amendment has been approved.

A substantially identical agreement was executed by Spain and Wallace with respect to the Richardson property and both agreements were accepted by the sellers.

The sale of the Winter property closed on December 5, 1994 and the sale of the Richardson property closed on December 6, 1994. Both sales were concluded under the same terms as the original contracts except for the closing date. At the closing of the sale of the Winter Property, Arlene Brandon received a commission of $6,818.45 and her husband received $1,341.14. At the closing of the sale of the Richardson Property, Arlene Brandon received a commission of $4,327.10 and her husband received $851.10. It is these commissions that Freund asserts are property of this bankruptcy estate and therefore is seeking an order for their turnover to the estate.

In opposing the turnover of the commissions, the debtors take the position that be-

cause the sales of the two properties did not close by August 28, 1994 as provided in the original contracts and because the contingencies were not met by August 1, 1994, both contracts became null and void. They take the position that the "Agreement to Extend Closing Date" gave rise to completely new and separate contracts and thus the commissions were completely earned post-petition. They further take the position that because the time period for the listing agreements had expired, they were not even legally entitled to demand commissions from the sales but that the sellers paid their commissions out of the goodness of their hearts.

The trustee takes the position that the commissions were earned as a result of the pre-petition contract for sale, and that accordingly the commissions were based on pre-bankruptcy services and are thus property of the estate. It is the trustee's contention that the Agreements to Extend the Closing Dates merely continued the pre-petition contracts in effect and did not give rise to completely new contracts.

## ANALYSIS

Property of the estate is defined broadly in the Bankruptcy Code. Unless it is exempted, property of the estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. The Eleventh Circuit has definitively explained that commissions from an independent contractor are not subject to the wage exemptions in section 222.11 of the Florida Statutes. *Schlein v. Mills (In re Schlein)* 8 F.3d 745, 756 (11th Cir.1993). Because the debtors have stipulated that they are independent contractors, the only issue is whether these commissions were earned "as of the commencement of the case."

■ Under Florida law, a broker's right to a commission is established by one basic principle: the procurement of a buyer ready, willing, and able to accept the terms and conditions of the seller. 1 Ralph E. Boyer, *Fla. Real Estate Transactions,* § 2.05[2] (1994); *Bryan & Greenless Real Estate v. Norman* 405 So.2d 181, 182 (Fla. 4th DCA

1981). The actual payment of the commission after the petition is filed has no effect on the status of the commission as property of the estate, as long as the Debtor's right to payment arose prepetition. *Johnson v. CMT Holding, Ltd. (In re Taylor & Campaigne, Inc.)* 149 B.R. 993, 996 (Bankr.M.D.Fla.1993). The Debtors argue that their "right to payment" arose when the subsequent agreements were executed on September 7, 1994. I find the proper dates to be the dates the contracts were accepted by the sellers, in September, 1993.

The subsequent agreements in this case did not destroy the old contracts that would give rise to the debtors' right to a commission. Rather, they are merely supplements to the old contracts. Florida law provides that addendums executed to extend closing dates on real estate contracts, do not necessarily destroy the old contracts, but can operate to supplement the original contracts. *See Bilic v. Aladdin Real Estate, Inc.*, 489 So.2d 170, 171–72 (Fla. 5th DCA 1986) (executing addendum that contained zoning conditions, provided evidence that seller accepted original contract for sale of property with similar zoning conditions). The facts disclose that the parties intended to treat the original contracts as viable.

First, in the original contracts, the contingency clauses provide for the termination of the contracts *upon written notification* by the buyer to the seller. Evidence of such a notification has not been presented, nor has any evidence been presented that the parties wished to terminate the original agreements. In fact, the August 23, 1994 letter sent to the Chapter 7 Trustee stating that a closing was "uncertain," implies the parties were still willing to work through the zoning problems. The extension agreements, by their own language, extend the time needed to solve these zoning problems, and say nothing regarding the termination of the original contracts.

The contingency clauses also provide for the return of the buyer's deposit if the contract was rendered null and void. Nevertheless, the deposits remained in the Bosshardt Realty Escrow account. The evidence portrays the buyers as willing participants to the original contract. If the change in closing date was truly a material alteration of that contract, there should have been some evidence of hesitation on the part of the buyers. In fact, it would be surprising if the buyers did view it as material, for the breadth of the case law seems to imply that such agreements are commonplace in the real estate business. Finally, the contingency clause contains a sentence that specifically allows the buyer to waive the termination provision of the contract. The surrounding facts lead to the conclusion that the buyers elected to waive their right to terminate, and instead chose to modify their rights under the original contract.

■ Furthermore, even if the parties did intend to terminate the old contract, the debtors are still entitled to the commissions as a result of their initiation of continuous negotiations between buyer and seller. *Information Exchange, Inc. v. Alligator Point Campground, Inc.*, 498 So.2d 624, 625 (Fla. 1st DCA 1986) *Fearick v. Smugglers Cove, Inc.*, 379 So.2d 400, 403 (Fla. 2d DCA 1980); *Fla. Real Estate Transactions*, § 2.05[4] (citing *Leon Realty, Inc. v. Hough*, 310 So.2d 767 (Fla. 1st DCA 1975)). Florida law provides that if brokers bring parties together and a sale has occurred as a result of continuous negotiations started by those brokers, they are entitled to commissions even though the sale is eventually consummated on terms different from that at which the property was listed. *National Airlines, Inc. v. Oscar E. Dooly Assoc., Inc.* 160 So.2d 53 (Fla. 3d DCA 1964); *see also Fearick*, 379 So.2d at 403; *Florida Real Estate*, § 2.05[4]. The brokers would be considered the "procuring cause" of the sale. *Brandenburg Inv. Corp. v. Farrell Realty*, 463 So.2d 558, 559 (Fla. 2d DCA 1985); *Ehringer v. Brookfield and Associates, Inc.*, 415 So.2d 774 (Fla. 5th DCA 1982); *Fearick*, 379 So.2d at 403. In this case, the negotiations went uninterrupted for over a year, and the sale was finally consummated on terms almost identical to the original agreements. Under Florida law, the debtors are entitled to a commission as the "procuring cause" of both of the sales in question. *Id.* The commission would be property of the estate because the negotiations were ini-

tiated before the petitions were filed. *Taylor & Campaigne* 149 B.R. at 996.

Finally, the debtors have argued that because their listing agreements expired before the sale was consummated, they are not entitled to commissions. It is black letter law in Florida that the expiration of a listing agreement has no effect on a broker's right to a commission. *Fla. Real Estate Transactions,* § 2.05[4] (citing *WTSP–TV, Inc. v. Number One Realty Center,* 490 So.2d 1273 (Fla. 2d DCA 1986)). For the reasons listed above, I find all of the commissions in question to be property of the estate, and that they should be turned over to the Chapter 7 Trustee together with the income tax refund.